# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MARVIS FARRIS, | ) | CASE NO. 1:19-cv-2599 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| ALLIANCE HEALTH CARE BRAEVIEW, | ) | [Resolving Doc. Nos. 39, 49, 50, 51] |
| INC., et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendants Alliance Health Care Braeview, Inc. ("Braeview"), Providence Healthcare Management, Inc. ("Providence"), and Eli Gunzburg ("Gunzburg") (collectively, "defendants"). (Doc. No. 39.) Plaintiff Marvis Farris ("Farris" or "plaintiff") filed a response in opposition (Doc. No. 46), and defendants filed a reply (Doc. No. 48). For the reasons set forth herein, defendants' motion is granted in part and denied in part.

## I.      Factual and Procedural Background

On November 6, 2019, Farris filed her complaint against Braeview under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111.03 ("OMFWSA"), and the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15 ("OPPA"), alleging that her former employer had misclassified her as an exempt employee and, therefore, willfully failed to timely pay her overtime. On February 17, 2021, with leave, Farris filed an amended complaint adding Providence and Gunzburg as defendants, alleging that, with Braeview, they were "joint employers" of plaintiff. (*See* Doc. No. 29.)

Braeview was a nursing and rehabilitation facility located in Euclid, Ohio. (Doc. No. 29 ¶ 8; Doc. No. 43-1, Deposition of Marvis Farris at 88–89.[1]) It was licensed by the State of Ohio and certified by the Centers for Medicare and Medicaid Services ("CMS") to provide services to Medicare and Medicaid recipients. Daily operation of Braeview was managed by the Administrator, a position held by Kimberly Armstrong ("Armstrong") at the time Farris was hired, but also held by different people during Farris' tenure at Braeview. (Doc. No. 43-1 at 66–67, 78, 83, 135.)

Farris has been a Licensed Practical Nurse ("LPN") in Ohio since 1992. (*Id*. at 17.) She has more than twenty (20) years experience in the position of Minimum Data Set ("MDS") Nurse. (*Id*. at 24.) She was employed at Braeview from July 16, 2016 to July 20, 2018 as its only MDS Nurse. (*Id*. at 66, 68, 79, 85, 166.) Farris asserts that, during her tenure, she also performed work for several other facilities under the Providence umbrella. (*Id*. at 163.)

As the MDS Nurse, Farris' primary job duty was assisting in the completion of written assessments, known as the "Minimum Data Set," for Braeview's residents. (*Id*. at 90.) It was her job to "captur[e] all care that was documented" (*id*.), so Braeview could obtain proper reimbursement from the various payer sources for all the services it provided. (*Id*. at 92.) Farris also had a role in completing the required "care plan" for each resident using the information provided to her by the interdisciplinary team, the resident's medical providers, the resident, and the resident's family. (*Id*. at 135–36.)

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system, a citation practice recently adopted by this Court despite a different directive in the Initial Standing Order for this case.

In her role as the MDS nurse, Farris was classified as exempt and was paid a salary, which was based on an hourly rate. (*Id*. at 68; *see also* Doc. No. 44-1, Deposition of Kimberly Armstrong at 27, 29.) Even though Farris was salaried, she was required by the Administrator to track her hours on a hard-copy desk calendar. (Doc. No. 43-1 at 71–72, 84.) Farris regularly worked more than 40 hours per week and was never paid overtime. (Doc. No. 46-8, Declaration of Marvis Farris ¶¶ 5–6.)

In November 2017, Farris was informed by then Administrator Tasha Harris ("Harris") that, due to "low census" at Braeview, her "work schedule as a MDS Nurse will be reduced from 40 hours weekly to 32 hours weekly[.]" (Doc. No. 46-9 Ex. I (Harris Letter) at 2.) Farris' pay was reduced on her next two paychecks (December 8, 2017 and December 22, 2017). (Doc. No. 46-10 Ex. J (Compensation Detail) at 6.) In June 2018, Farris was similarly informed by then Administrator Richard Washington ("Washington") that her hours would once again be reduced due to low census; this is reflected in her paycheck for June 22, 2018. (Doc. No. 43-1 at 181; Doc. No. 46-10 at 9.)

Farris complained to Washington that, if she was a salaried employee, she should not be subject to deductions in pay and hours due to low census; she emailed him guidance from the United States Department of Labor's website along with provisions of the Code of Federal Regulations regarding the salary basis test for exempt employees. (Doc. No. 46-8 ¶ 9.) Washington forwarded Farris' email to Laurie Urbanowicz ("Urbanowicz"), vice president of human resources at Providence, who directed Washington to "put everyone on hourly[,]" including Farris. (Doc. No 42-1, Deposition of Laurie Urbanowicz at 35.) Urbanowicz testified that, the next day, she realized she had made a mistake and later advised Washington to return Farris to salaried status; she also directed that Farris be reimbursed for any lost pay resulting from the mistake. (*Id*. at 35, 38–40.)

It appears, however, that Farris' employment was terminated on July 20, 2018 (due to repeated unprofessional interactions with a co-worker) before her exempt status was actually restored. (Doc. No. 46-8 ¶ 10; Doc. No. 46-6 Ex. F (Email and Notice of Disciplinary Action) at 2; *see also* Doc. No. 46-5 Ex. E (November 2017 Write-Up).)

## II.    Discussion

### A.    Legal Standard on Summary Judgment

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find

4

by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; "[a] mere scintilla of evidence is insufficient[.]" *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## B.    Analysis

Farris claims in this lawsuit that defendants (whom she characterizes as "joint employers") improperly classified her as "exempt" under the FLSA and did so willfully. Each of her claims, both federal and state, is predicated on this assertion.

Defendants argue that they are entitled to summary judgment because they properly classified Farris as "exempt" under the FLSA. Defendants further argue that, even if there is a material factual dispute over Farris' exempt classification, defendants Providence and Gunzburg are entitled to summary judgment and dismissal because neither was Farris' "joint employer" under the requisite "economic reality test." Finally, defendants argue that any failure to properly classify Farris' position cannot be found "willful"—which would entitle Farris to a three-year statute of limitations and liquidated damages. Each argument will be separately addressed.

### 1.    *Farris' Exempt Classification under FLSA*

The FLSA requires an employer to compensate an employee who works more than forty hours per workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA exempts from this overtime pay requirement any employee who is employed "in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). Until recently, courts "'narrowly construed [these exemptions] against the employers seeking to assert them[.]'" *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)). But in *Encino Motorcars, LLC v. Navarro*, __ U.S. __, 138 S. Ct. 1134, 200 L. Ed. 2d 433 (2018), the Supreme Court cast doubt on the continued viability of that principle, noting that, since "the FLSA gives no textual indication that its exemptions should be construed

narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation." *Id.* at 1142 (internal quotation marks and citation omitted).

Defendants argue that Farris' position as the MDS Nurse at Braeview "fell squarely within the administrative exemption." (Doc. No. 39-1, Memorandum in Support at 13.) The FLSA does not define the administrative exemption. Regulations issued by the United States Department of Labor ("DOL"), which courts generally give "controlling weight[,]" *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 741 (6th Cir. 2000), identify the criteria that must be met to satisfy the administrative exemption under the FLSA.

An employee is considered "employed in a bona fide administrative capacity" if the employee: (1) is "[c]ompensated on a salary or fee basis . . . of not less than $684[2] per week . . . ;" (2) has a primary duty that "is the performance of office or non-manual work directly related to the management of general business operations of the employer or the employer's customers;" and (3) has a "primary duty" that "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (footnote added).

There is no dispute as to the second factor; but Farris claims that defendants are not entitled to summary judgment because they cannot establish the first and third elements of the test for the exemption.

Plaintiff asserts that, because she was paid on an hourly basis for three pay periods out of her two years of employment (for the paychecks issued on December 8, 2017, December 22, 2017,

---

[2] At the time of Farris' employment, the salary requirement was $455 per week. She does not challenge that her annual salary, when properly paid, was above the minimum threshold. (Doc. No. 46 at 16 n. 8.) She does argue that she was not paid on a "salary . . . basis" for her entire employment.

and June 22, 2018), she was not compensated on a salary basis. She relies on 29 C.F.R.

§ 541.602(a), which provides, in relevant part as follows:

> (a) General rule. An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

>> (1) Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work.

>> (2) An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

>> * * *

29 C.F.R. 541.602. Further,

> [a]n employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis. . . .

29 C.F.R. § 541.603(a). Farris asserts that her three reduced paychecks demonstrate defendants'

"actual practice of making improper deductions[.]" (Doc. No. 46 at 17-18.) She cites *Ellis v. J.R.'s*

*Country Stores, Inc.*, 779 F.3d 1184 (10th Cir. 2015) for the proposition that, even if she was

otherwise properly classified as exempt (which she denies), defendants lost the right to treat her as

exempt because of those three instances of improper deductions based on decreased hours due to

low census. (*Id.* at 18.) But what Farris fails to acknowledge is that the Court in *Ellis* affirmed the

grant of summary judgment in the employer's favor, finding that the employer's correction of its

8

one-time improper deduction from the plaintiff's pay did not deprive the employer of the exemption. *Ellis*, 779 F.3d at 1189 (noting the "savings provision" in 29 C.F.R. § 541.603(c), which preserves the exemption "if the employer reimburses the employee[] for such improper deductions").

Here, defendants admit that Farris' pay was improperly deducted on three occasions. But, as in *Ellis*, defendants availed themselves of the savings provision by reimbursing Farris. On January 5, 2018, Braeview gave Farris a manual check for $875.39 as compensation for the 32 hours she was shorted in her paychecks dated December 8, 2017 and December 22, 2017; on June 29, 2018, Farris was given a manual check for $450.09 to remedy the 16-hour mistake on her June 22, 2018 paycheck. These payments are reflected in the compensation records attached to plaintiff's opposition brief. (Doc. No. 46-10 at 7, 10.)

As correctly argued by defendants, Urbanowicz testified that it was her mistake to advise the Administrator to convert Farris to hourly and to pay her in that fashion on three occasions when there was a low census. When an improper deduction is "isolated or inadvertent" it "will not result in loss of the exemption . . . if the employer reimburses the employee[] for such improper deductions." (Doc. No. 48 at 6–7 (quoting 29 C.F.R. § 541.603(c).) Farris was reimbursed. Therefore, these isolated deductions would not deprive defendants of a proper administrative exemption.

That, however, does not end the analysis because the parties dispute whether Farris' primary duties "include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Failing to meet that third requirement of the test would deprive defendants of a proper exemption.

9

Defendants argue that "[t]he exercise of discretion and independent judgment involves the comparison and evaluation of possible course[s] of conduct and making decisions after several possibilities have been considered." (Doc. No. 39-1 at 16 (citing 29 C.F.R. § 541.202(a)).) The regulation identifies factors to consider, including, but not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). Although the term discretion and independent judgment "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review[,]" it must involve "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(c), (e).

Defendants argue:

> Plaintiff's job duties as the sole MDS Nurse required the exercise of discretion and independent judgment on matters of significance. Her responsibilities were central to the purpose for which Braeview existed and its financial viability. (Pl. Dep. 91; Armstrong Dep. 55.) Plaintiff was responsible for creating and updating the nursing care plan. (Pl. Dep. 104-05; Armstrong Dep. 46.) She selected nursing interventions to optimally and safely care for the resident, which acted as a roadmap for care delivery. (Pl. Dep. 135-36, 145, 156; Armstrong Dep. 45-46.) By following the Plaintiff's instructions, staff provided care in a manner that was most conducive to the health and well-being of the residents. (Armstrong Aff. ¶4.) The failure of Plaintiff to exercise professional discretion and

use good independent judgment in this job duty could result in harm to the resident. (Armstrong Aff. ¶4.) Plaintiff's professional discretion and independent judgment affected the most important aspect of Braeview's business operations – the care of the residents.

Plaintiff prepared and submitted the MDS – the requisite payment tool used by the government and insurance companies. (Pl. Dep. 91-93, 126.) Her coding on the MDS and assignment of the ARD [assessment reference date] determined the amount of money the facility would receive for a resident's care. (*Id*. 98-99, 140.) By selecting the most appropriate ARD, she ensured that the facility received the highest level of reimbursement within the confines of the regulatory framework. (*Id*. 101.) She did not require approval to submit the MDS. (*Id*. 126.) By transmitting the MDS, Plaintiff was directly responsible for the overwhelming majority of Braeview's revenue and, by extension, it's [sic] financial success or failure.

Plaintiff was responsible for ensuring the accuracy of the MDS. (Pl. Dep. 131; Armstrong Dep. 38, 40.) Errors in the document could lead to significant legal civil and criminal charges, penalties, and fines against the facility. (Pl. Dep. 122-23.) When mistakes were alleged, she investigated whether an error occurred and remedied the problem. (*Id*. 129-31.) She also ensured that the MDS and care plan were congruent, thereby minimizing errors and confusion among caregivers when delivering services to the residents. (Pl. Dep. 137.)

Finally, Plaintiff responded to questions and concerns from payer sources and regulating entities regarding the MDS and care plans. (Pl. Dep. 132, 134.) When residents or family members had a nursing question at a care plan meeting, she was there to address the issue. (*Id*. 153.) Though Plaintiff may not have directly resolved the problem, she was the "face" of the company.

Plaintiff met many of the factors for determining whether the position exercised discretion and independent judgment in the performance of her duties. Her duties regarding care plans and the MDS substantially affected business operations. Submission of the MDS committed the facility to 90% of its revenue. If an error on the MDS was identified — errors which could have civil and criminal implications — she investigated and corrected, as necessary. She assisted in the resolution of complaints. Plaintiff's duties required the exercise of discretion and independent judgment.

(Doc. No. 39-1 at 17–19.)

In opposition, Farris asserts that the process of completing an MDS did not involve the kind of discretion and evaluation contemplated by the regulation. She argues:

[C]ompletion of the MDS involved the application of residents' information to **well-established procedures and specific standards in manuals and other sources**—i.e., the CMS RAI [resident assessment instrument] manual. (Farris Dep. 90) Farris, along with the Interdisciplinary Team members, input information into the MDS about the resident (See Exhibit A). Farris obtained that information by reviewing medical records and obtaining documentation from the Interdisciplinary Team. Farris used that information, in conjunction with the RAI, to complete the resident's MDS. Farris did not make decisions about how resident information was used; rather, she transferred information from non-standardized forms (e.g. medical records) to standardized forms (i.e., the MDS)[.] The RAI instructed how to schedule the MDS and fill out each and every item on the MDS. The RAI does not give Farris discretion as to how to respond to questions. (Farris Dep. 90) When the MDS was complete, the resident was automatically placed into a category which dictated the level and type of care. (*Id*. 140) Farris did not exercise any discretion or judgment on the level or type of care the resident would receive.

By way of example, section H of the MDS (Exhibit A, p.24) requests information about a resident's bladder and bowel habits. To complete Section H, Farris reviewed the resident's medical records and spoke with Braeview's nursing assistant to obtain the necessary information about the resident's toileting habits. (Farris Dec. ¶ 21) If the medical records (or the nursing assistant) indicated that the resident had an external catheter, Farris checks the box next to: "B. External catheter." (*Id*.; Exhibit A) Anything that Farris documented in Section H of the MDS must be supported by the resident's medical records. (Farris Dec. ¶ 23) Farris cannot exercise discretion or independent judgment.

Section I of the MDS (Exhibit A, p.25) required Farris to document the resident's active diagnoses. In order to obtain this information, Farris reviewed the resident's medical providers' progress notes and history. If this documentation stated that the resident suffered from hypertension, for example, then Farris marked the box next to: "10700 Hypertension." (Farris Dec. ¶ 22) Farris could [not] mark a box that was not supported by the resident's medical records. (Farris Dec. ¶ 23)

\* \* \*

In addition to the MDS, Farris created resident care plans. (Farris Dep. 136) The MDS schedule, not Farris, automatically determines when a care plan is created. (*Id*.) It is created with the input of the Interdisciplinary Team, the resident, and the resident's family. (*Id*.) Farris did not medically assess residents to determine what particular need he or she may have. Rather, she obtained the necessary information from, and followed the orders of, the Interdisciplinary Team to complete the care plan. (Farris Dep. 117, 156; Armstrong Dep. 47) Lastly, the MDS was reviewed and approved by an RN before it was finalized and submitted. (Armstrong Dep. 44)

12

There is no evidence that Farris' primary job duties gave her the authority to formulate or implement management policies or procedures; she could not unilaterally commit/bind Defendants in matters that have significant financial impact; Farris did not have authority to waive or deviate from established policies and procedures—in fact Federal and State law prohibited her from doing so; she did not have authority to negotiate with third parties and bind Defendants; she did not provide "expert advice" to management; Farris was not involved in management meetings to discuss strategy or business planning—she was present in a note-taking capacity; and Farris did not represent Defendants in handling complaints, arbitrating disputes or resolving grievances. *See* 29 CFR § 541.202(b).

(Doc. No. 46 at 19–21 (emphasis in original).)

It is clear that the parties view Farris' role as MDS Nurse very differently. They more or less agree on the tasks she performed, but they disagree as to whether the performance of those tasks required the exercise of discretion and/or independent judgment, or amounted to no more than data entry.

Although the Court has determined that defendants have established the first requirement for application of an administrative exemption (salary basis) and plaintiff does not dispute the second requirement (office or non-manual work directly related to business operations), a fact-finder must resolve the material factual disputes relating to the third requirement — whether Farris had a primary duty that included the exercise of discretion and independent judgment with respect to matters of significance. Therefore, summary judgment is precluded.

### 2.     *"Joint Employers" under the "Economic Reality Test"*

Defendants argue that, even if this Court finds, as it has, that there are material factual disputes regarding Braeview's classification of Farris as an exempt employee, the Court should nonetheless dismiss Providence and Gunzburg because neither can be considered a joint employer. (Doc. No. 39-1 at 19.)

13

The FLSA defines "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The FLSA defines "employee" to "mean[] any individual employed by an employer[,]" and "employ" to "include[] to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g).[3] The Sixth Circuit has accurately described these definitions as "generally unhelpful," *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011), but has further noted that "'[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications.'" *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (quoting *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam)).

"[T]he employment relationship determination 'is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528, 70 S. Ct. 755, 94 L. Ed. 1017 (1950)). "Instead, the 'economic reality' of the relationship between a plaintiff and a defendant 'determines whether their relationship is one of employment.'" *Id.* (quoting *Solis*, 642 F.3d at 522 (further citation omitted)). But the "'economic reality'" standard "is not a precise test susceptible to formulaic application." *Id.* (citing *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). "[T]he total relationship must be examined, rather than isolated factors." *Donovan*, 736 F.2d at 1116 (citing *Dunlop v. Dr. Pepper-Pepsi Bottling Co.*, 529 F.2d 298 (6th Cir. 1976)). Courts are required, on a case-by-case basis, to "consider[] the 'circumstances of the whole business activity[.]'" *Ellington*, 689 F.3d at 555 (quoting *Donovan*, 736 F.2d at 1116) (further citation omitted).

---

[3] Ohio law is virtually identical. *See* Ohio Rev. Code § 4111.03(D)(1), (2), (3).

"[M]ore than one 'employer' can be simultaneously responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (citing *Dole*, 942 F.2d at 965). The FLSA does not define "joint employer," nor has the Sixth Circuit "explicitly identified a test for evaluating joint employment relationships in the context of FLSA claims." *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 779 (E.D. Mich. 2021). "District courts in this Circuit are divided with respect to the proper test (or tests) to apply to determine if a defendant is a joint employer." *Id.* at 779–80 (citations omitted) (discussing a number of potential frameworks for analyzing joint employment). But, according to another federal district court, if an entity meets the definition of "employer" vis-a-vis an employee and another entity also meets the definition vis-a-vis the same employee, then the two are "joint employers" of that employee. *See New York v. Scalia*, 490 F. Supp. 3d 748, 776 (S.D.N.Y. 2020).[4] In the Sixth Circuit, "[w]hether a party is an employer within the meaning of the FLSA is a legal determination." *Dole*, 942 F.2d at 965 (citing *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986); *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986)).

Defendants argue that Braeview was merely a client of Providence and that neither Providence nor Gunzburg was involved in Farris' employment. (Doc. No. 39-1 at 21.) Defendants claim that the role of Providence was only to support Braeview in achieving its purpose of

---

[4] *Scalia* offers a helpful example of joint employers:

> Imagine an employee works for a staffing agency. The staffing agency is the employee's employer. Then imagine that a corporation hires the staffing agency to provide temporary employees. The staffing agency hires out the employee to the corporation. Assume that the corporation also meets the FLSA's definition of employer. Both the staffing agency and the corporation become joint employers. The staffing agency was the employee's "employer." Now it is her "joint employer." Why? Because the corporation has also become the employee's employer. Now assume that the corporation hires the employee full time. The staffing agency stops qualifying as the employee's employer. The corporation was the employee's "joint employer." Now it is just her "employer." Why? Only because the staffing agency is no longer her employer.

490 F. Supp. 3d at 776–77.

providing healthcare services to Braeview's residents by assisting it with accounting, billing and payroll processing, and by making recommendations to help the facility operate more efficiently. (*Id*. at 22 (citing Doc. No. 39-2 (Gunzburg Aff.) ¶ 2).) Gunzburg, having only a minority interest in Braeview, vested control of Braeview's operations in its Administrator. (*Id*. at 26 (citing Doc. No. 41-1 (Gunzburg Dep.) at 20; Doc. No. 39-2 ¶¶ 2, 8, 10).)

Farris maintains that both Providence and Gunzburg were each "joint employers" with Braeview. She points to guidance issued by the Department of Labor ("DOL") in January of 2020 that set forth four factors relevant to determining whether an entity is a "joint employer." (Doc. No. 46 at 23.) These included whether the employer: "(i) [h]ires or fires the employee; (ii) [s]upervises and controls the employee's work schedule or conditions of employment to a substantial degree; (iii) [d]etermines the employee's rate and method of payment; and (iv) [m]aintains the employee's employment records." (*Id.* (citing *Rhea v. W. Tenn. Violent Crimes & Drug Task Force*, 825 F. App'x 272, 277 n.4 (6th Cir. Aug. 25, 2020) (citing 29 C.F.R. § 791.2 (a)(1))).) But this regulation became effective on March 16, 2020 (almost two years after Farris' employment with Braeview ended), *see* 85 Fed. Reg. 2820-01, 2020 WL 225175 (Jan. 16, 2020), and was rescinded several months later (as a result of the decision in *Scalia*, *supra*), *see* 86 Fed. Reg. 40939-01, 2021 WL 3207510 (July 30, 2021).

### *Providence*

There is nothing in this record to suggest that Providence was an "employer" of Farris and/or a "joint employer" of Farris with Braeview. With respect to its client Braeview generally — and Farris specifically — Providence was no more than a management resource by virtue of the contractual relationship between it and Braeview. (Doc. No. 39-2, *passim*; Doc. No. 39-3 (Armstrong Affidavit) ¶ 6; Doc. No. 39-4 (Urbanowicz Affidavit) ¶ 2; Doc. No. 41-1 at 8–9.) Thus,

the Court concludes as a matter of law that Providence was not an employer of Farris and defendants' motion for summary judgment dismissing Providence from this action on that basis is granted.

### *Gunzburg*

The record is less clear with respect to whether Gunzburg was an "employer" of Farris. Gunzburg was Braeview's president and sole corporate officer. His education includes an MBA in banking and finance and "certification" as an "administrator." (Doc. No. 41-1 at 6–7.) Gunzburg owned 36% of Braeview along with "some" trusts,[5] but at the time of his deposition was unable to remember what trusts held an ownership interest in Braeview. (*Id*. at 11.)

Gunzburg attests in his affidavit that he had no participation in interviewing or hiring Farris, in determining her wages, in her orientation, in determining her schedule or work hours, in evaluating her work or disciplining her, or in maintaining her personnel file, all of which were all delegated to Braeview's Administrator.[6] (Doc. No. 39-2 ¶ 10.) But while Gunzburg "delegated someone to handle the day-to-day[,] . . . *they were carrying out my will*." (Doc. No. 41-1 at 16 (emphasis added).)

With respect to labor and employment matters, Gunzburg testified in his deposition that he played a role in determining policies that would have affected all employees of Braeview,

---

[5] In its answers to Farris' interrogatories, Braeview states that it is owned 36% by defendant Eli Gunzburg, 15% by the Eli Gunzburg Irrevocable Trust, and 49% by the Frank Gunzburg Succession Trust. (*See* Doc. No. 39-5 at 2–3.)

[6] Administrator Armstrong corroborated Gunzburg's statements in both her affidavit (*see* Doc. No. 39-3 ¶ 6) and throughout her deposition regarding her day-to-day responsibilities. (*See* Doc. No. 44-1 at 13–14, 15 ("As the administrator at BraeView [sic], I overseen [sic] every department. I hired and terminated all department heads. I did all the evaluations and wage increases, made sure everybody was . . . within budget. . . . I had supervisory roles over every department.").

including Farris, though he was frequently unable to remember specifics.[7] For example, Gunzburg testified that, with respect to Braeview employees, he had a role in determining whether Braeview needed additional nurses (*id*. at 20), was involved in employee termination (*id*. at 21), had a role in creating job descriptions for Braeview employees (*id*. at 25), had a role in setting payroll policies for Braeview employees (*id*. at 25–26), made the "ultimate determination" on pay scales for Braeview employees (*id*. at 26), made the "ultimate determination" about paid time off and vacation policies for Braeview employees (*id*. at 29), and was involved in decisions about salary exempt status for Braeview employees (but could not recall if he was involved in the decision regarding Farris) (*id*. at 27–28). Providence's vice-president of human resources, Laurie Urbanowicz, testified that she did not make the decision regarding Farris' exempt status and that, aside from her, Gunzburg was responsible for making determinations as to the exempt status of Braeview employees; Urbanowicz further testified that she "would assume Eli Gunzburg" made the initial determination that Farris' position was exempt "when everything was set up" at Braeview. (Doc. No. 42-1 at 33, 48.) Gunzburg testified that he recalled making salary exempt determinations, but "just [didn't] remember specific conversations." (Doc. No. 41-1 at 28.)

With respect to Braeview's operations, Gunzburg had a role in creating resident care policies and procedures for Braeview clients (*id*. at 29), was involved in budget planning and obtaining a loan for Braeview, and had a role in ensuring that Braeview was compliant with all state and federal regulations (*id*. at 30–31). As to the decision to close Braeview, which is owned by Gunzburg and two trusts, Gunzburg testified that the decision was "collective, let's just call it

---

[7] Indeed, Gunzburg could not remember and "[had] no idea" when he became president of Braeview. (Doc. No. 41-1 at 14.)

that[,]" and that "who made the actual call, I don't remember[,]" but ultimately conceded that he "[didn't] think" that anyone else had the authority to make that decision. (*Id.* at 12–15.)

Defendants admit that Gunzburg was responsible for certain employment related decisions at Braeview but argue that he only made specific employment decisions regarding the administrator and had no role in patient care and, while Gunzburg was admittedly the "top man" at Braeview, defendants attribute his involvement with decisions about Braeview employees and operations to his capacity as an officer of the company. (*See* Doc. No. 48 at 11; Doc. No. 41-1 at 32–33.) With respect to Gunzburg's percentage ownership in Braeview, he himself owns 36% of Braeview and the Eli Gunzburg Trust owns 15%. Defendants argue that just because Gunzburg's name is on the trust does not mean he controls the trust; but were the factfinder to determine that Gunzburg did control the trust, his ownership of Braeview would exceed 50%.

Regardless of Gunzburg's ownership interest in Braeview, that issue is not dispositive of his status as an employer under the FLSA. *See Acosta v. MICA Contracting, LLC*, No. 1:18-cv-590, 2021 WL 4972378, at *15 (S.D. Ohio Oct. 26, 2021) ("Merrick argues that she had no ownership interest in J&E and therefore cannot be held liable as an employer. But ownership interest is not dispositive. An individual who exercises significant operational control may still be held liable as an employer.") (collecting cases and citing among authority *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (noting employment relationships do not lend themselves to "a precise test" but should instead "be determined on a case-by-case basis upon the circumstances of the whole business activity")). "In the Sixth Circuit, being the 'top man' at a corporation that functions for an individual's profit is sufficient to impose FLSA liability . . . even when an individual employer alleges that other, lower members of management made day-to-day operational decisions." *Hatmaker v. PJ Ohio, LLC*, No. 3:17-cv-146, 2019 WL 1367663, at *4 (S.D. Ohio Mar. 26, 2019) (citing *Dole*, 942 F.2d at 966); *Matthews v. ALC Partner, Inc.*, No. 2:08-cv-10636, 2008 WL 5188760, at *14 (E.D. Mich. Dec. 9, 2008) (same) (citing *Dole*).

19

Based upon the record before the Court on summary judgment, the Court concludes that there is more than a scintilla of evidence from which a reasonable juror could find that Gunzburg owned a majority share in Braeview and/or the business operated for his profit, and that Gunzburg played a significant role in labor, employment, and operational decisions at Braeview (even though he delegated day-to-day decisions to the administrator). Were the jury to find such facts, those facts would support a determination that Gunzburg is a joint employer under the FLSA as a matter of law. *See Dole,* 942 F.2d at 966 ("In short, the evidence clearly demonstrates that Schubiner was the "top man" at Elliott Travel, and the corporation functioned for his profit . . . [and] summary judgment was appropriate on this question of law.") (internal citation omitted); *U.S. Dep't of Labor v. Cole Enters., Inc*., 62 F.3d 775, 778 (6th Cir. 1995) (A corporate officer with operational control qualifies as an "employer" under the FLSA when the officer has a significant ownership interest in the corporation, controls significant functions of the business and employment decisions.); *see also Rebollar v. DBC Food, LLC*, No. 3:18-cv-00218, 2021 WL 4888508, at *4 (W.D. Ky. Oct. 19, 2021) ("Because the testimony and evidence are unclear on whether Toro, Oscar, or Benigno qualify as employers, the question is a triable issue of fact reserved for the jury."); *Stocker v. Marjakaj*, No. 14-cv-13386, 2015 WL 13861151, at *6 (E.D. Mich. Sept. 17, 2015) "[A] jury could find that Universal Coney and Detroit's Finest II were under joint management or control between October 2012 and August 2013, and should therefore be considered a joint employer under the FLSA.").

Defendants' motion for summary judgment dismissing Gunzburg from this action on the grounds that he is not a joint employer is denied.

20

### 3. *Liquidated Damages; Willfulness*

Farris claims that defendants not only misclassified her position as exempt, but that such misclassification was willful, entitling her to recover unpaid overtime and liquidated damages for a period going back three years (rather than the usual two). "An employer who violates the FLSA must pay the affected employee 'the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and [ ] an additional equal amount as liquidated damages.' The statute of limitations for the FLSA is two years for non-wil[l]ful violations and three years for wil[l]ful ones." *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 605 (6th Cir. 2013) (citing 29 U.S.C. §§ 216(b), 255(a)).[8]

Defendants seek summary judgment on this issue, arguing that, even if it is ultimately determined that Farris was not properly classified as exempt, "[t]here is no evidence that [d]efendants had actual knowledge that the MDS Nurse position was misclassified." (Doc. No. 39-1 at 28–29.)

"The word 'willful' . . . is generally understood to refer to conduct that is not merely negligent." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). To establish willfulness, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute[.]" *Id.* (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) (rejecting as sufficient for willfulness that the employer "simply knew of the potential applicability of the [statute]")).

---

[8] "[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to [plaintiff's claim] was in good faith and that [the employer] had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages or award any amount thereof[.]" 29 U.S.C. § 260; see also 29 C.F.R. § 790.22 (discretion of the court as to liquidated damages).

Regulations define "reckless disregard of the requirements of the [FLSA]" as "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. Defendants argue that they "reached out to multiple employment attorneys on several occasions for an opinion regarding exempt status, [and therefore] [p]laintiff cannot prove a reckless disregard." (Doc. No. 39-1 at 29.) But seeking legal advice alone is not dispositive of the issue of willfulness. Armstrong, as administrator of Braeview, and Urbanowicz, as vice-president of Providence, testified that they did not play a role or make the decision regarding Farris' exempt status, did not know who did, and never inquired about Farris' day-to-day job duties or determined what her job entails, nor is there any evidence that Gunzburg did so. (*See* Doc. No. 44-1 at 28–29; Doc. No. 42-1 at 32-33, 47–48.) Given the record before the Court on summary judgment, the Court cannot determine as a matter of law that defendants' alleged FLSA violation was not willful. *See e.g. Stansbury v. Faulkner*, 443 F. Supp. 3d at 935 (W.D. Tenn. 2020) ("[A] reasonable factfinder could find that Faulkner's failure to inquire into the number of hours Stansbury worked and compensating her for forty hours a week regardless was a willful violation of the FLSA. ").

Here, the Court has determined that there is a genuine issue of material fact as to whether Farris was properly classified as an exempt employee because there is a dispute as to the discretionary nature of her job duties. If a violation is found, the "willfulness" of that violation is a factual determination best resolved by a fact-finder or by way of an appropriate Rule 50 motion at trial. *See Stansbury*, 443 F. Supp. 3d at 935 ("The willfulness determination is a question of fact. A district court should only answer the question as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.") (collecting cases).

To the extent defendants seek summary judgment on the issue of willfulness, their motion is denied.

III.     **Conclusion**

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 39) is granted in part and denied in part as follows: (1) defendants' motion for judgment on Farris' FLSA and state law claims is denied; (2) defendants' motion for judgment on Farris' claim that their violation of the FLSA and state law was willful is denied; (3) defendants' motion for judgment as to defendant Gunzburg is denied; and (4) defendants' motion for judgment as to defendant Providence is granted.

In addition to moving for summary judgment, defendants also seek to bifurcate the trial into a liability phase and damages phase on the grounds that the evidence addressing these issues is entirely distinct and judicial efficiency will not be compromised, and that defendants may suffer prejudice if damages and liability issues are addressed together. (Doc. No. 49.) Plaintiff does not oppose defendants' motion to bifurcate. (Doc. No. 55 at 2.) Accordingly, defendants' motion to bifurcate the trial into two phases—liability and damages—is granted.

Also before the Court are two motions in limine. (Doc. Nos. 50 and 51.) These motions are denied without prejudice and may be reasserted, if appropriate in light of the Court's ruling on defendants' summary judgment motion, in accordance with the timeline established by the Court in a separately published order scheduling the final pretrial conference and trial in this case,

**IT IS SO ORDERED**.

Dated: February 18, 2022

HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE

23